2026 IL App (1st) 242205-U

Nos. 1-24-2205 & 1-24-2223 (cons.)

First Division
June 30, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| DOUGLAS SMITH, U.S. PLACEMENT CONSULTANTS, LLC, JUSTIN ARABO, FIRST RATE INSURANCE AGENCY, MIDLAND IRA, INC. FBO DOUGLAS SMITH | ) ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | No. 18 L 10916 |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | |
| WE'LL CLEAN, INC., an Illinois Corporation, WE'LL CLEAN IT, INC., an Illinois Corporation, DAVID LAUNIUS, Individually, Defendants, and AVALON VENTURES CHICAGO, LLC, an Illinois Limited Liability Company, and TODD STERN and ADAM STEINBERG, Individually, | ) ) ) ) ) ) ) ) ) | |
| Defendants-Appellees | ) ) | |
| DAVID LAUNIUS, individually, WE'LL CLEAN, INC. and WE'LL CLEAN IT, Illinois Corporations, | ) ) ) ) | |
| Counter-Plaintiffs, | ) | |

v.                                              )
                                                )
                                                )
TODD STERN and ADAM STEINBERG,                  )
individually, and AVALON VENTURES               )
CHICAGO, LLC, an Illinois Limited Liability     )          Honorable
Company,                                        )          Daniel J. Kubasiak
                                                )          Judge, Presiding.
        Counter-Defendants.

_____

JUSTICE COBBS delivered the judgment of the court.

Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court's judgment is affirmed where plaintiffs did not prove an exception to the rule against corporate successor liability or that defendants tortiously interfered with a contract. Additionally, the bankruptcy trustee did not show that the circuit court erred in rejecting its claim of a fraudulent transfer or in denying him leave to file a futile amended crossclaim.

¶ 2    This appeal concerns the operation of a car wash located at 2261 N. Clybourn Avenue in Chicago (the Property). For many years prior to May 2018, the Property was home to a car wash operated by We'll Clean, Inc. (We'll Clean). David Launius was the sole owner of We'll Clean, as well as a separate corporation called We'll Clean It, Inc. (We'll Clean It).

¶ 3    Amid rising financial difficulties, Launius, We'll Clean, and We'll Clean It (collectively, the Launius Parties) entered into a series of short-term, high-interest loans in 2017. In three such loans, plaintiffs Douglas Smith and Justin Arabo, as well as entities wholly owned by either Smith or Arabo (collectively, the Smith and Arabo Parties), loaned the Launius Parties a total of $357,250 at exorbitant interest rates of around 60%. According to the promissory notes and witness testimony, these loans were designed to allow Launius to pay various debts while also raising his

credit score enough to qualify for a Small Business Association (SBA) loan that he would then use to repay the Smith and Arabo Parties.

¶ 4    However, the Launius Parties never obtained an SBA loan, and the loans from the Smith and Arabo Parties quickly fell into default. Unable to pay his debts, Launius continued to search for additional sources of capital. In the early months of 2018, Launius discussed selling We'll Clean to defendants Todd Stern and Adam Steinberg. An Asset Purchase Agreement was drafted in April 2018, but Stern and Steinberg walked away from the deal without signing the agreement upon learning of the Launius Parties' extensive debts.

¶ 5    Ultimately, Launius signed a document terminating We'll Clean's lease of the Property effective May 14, 2018. The next day, May 15, 2018, Stern and Steinberg signed a fresh lease to operate a car wash on the Property through their newly-founded company, Avalon Ventures Chicago, LLC (Avalon). Thereafter, Avalon operated the car wash under the name Auto Spa Chicago (Auto Spa).

¶ 6    In October 2018, the Smith and Arabo Parties initiated this litigation by filing a complaint in the circuit court alleging various theories of recovery against both the Launius Parties and Stern, Steinberg, and Avalon. In December 2019, the Smith and Arabo Parties settled their claims against the Launius Parties. In January 2024, We'll Clean filed for Chapter 7 bankruptcy protection. The trustee of We'll Clean's bankruptcy estate subsequently filed crossclaims against Stern and Steinberg, but not Avalon.

¶ 7    The matter advanced to a bench trial in July 2024. At trial, the Smith and Arabo Parties proceeded on two counts against Stern, Steinberg, and Avalon: (1) successor liability for the Launius Parties' debts based on fraud and (2) tortious interference with a contract for inducing the

Launius Parties to breach the promissory notes. The trustee proceeded on nine counts against Stern and Steinberg ranging from trademark violations to fraudulent transfers.

¶ 8    After a 5-day bench trial, the circuit court issued a ruling in favor of Stern, Steinberg, and Avalon on all counts. The Smith and Arabo Parties and the trustee each filed separate timely notices of appeal, and this court later granted the parties' agreed motion to consolidate the appeals. For the reasons that follow, we now affirm the judgment of the circuit court.

¶ 9                                    I. BACKGROUND

¶ 10    The record shows that We'll Clean operated a car wash at the Property for many years prior to May 2018. The car wash was a "hand" car wash, meaning that We'll Clean employees washed customers' vehicles by hand rather than with automated machinery. At all relevant times, Launius was the sole owner of We'll Clean and Rick Levinson was the sole owner and lessor of the Property.

¶ 11                          A. The Smith and Arabo Loans

¶ 12    By 2017, Launius and We'll Clean were experiencing significant financial difficulties. In January 2017, Launius borrowed $100,000 from Smith and one of Smith's companies, U.S. Placement Consultants, LLC. Under the promissory note, the Launius Parties were to pay Smith $130,000 after six months. The note also recites the Launius Parties' intent to use the loan proceeds to pay certain enumerated debts while also allowing Launius to obtain an SBA loan that he would use to repay Smith. The note further provides that the loan was secured by "among other items, (i) monthly revenues of We'll Clean, Inc., its profits, and its assets [and] (ii) a Personal Guaranty of herewith from David Lanius[.]" Additionally, the note states that the "loan is secured by the revenues of We'll Clean, Inc., We'll Clean It, Inc., David Launius, or by the SBA loan[.]" This

loan was later changed by addendum to increase the term by six months, the principal to $157,250, and the repayment amount to $180,000.

¶ 13     On July 15, 2017, the Launius Parties also borrowed $100,000 from Arabo and First Rate Insurance Agency, one of Arabo's companies. As with the Smith loan, the Launius Parties were to repay Arabo $130,000 in six months. The promissory note also contained identical language describing the collateral and Launius' intent to obtain an SBA loan.

¶ 14     Also on July 15, 2017, the Launius Parties borrowed another $100,000 from Smith and Midland IRA FBO Douglas Smith, which is Smith's personal retirement account. The promissory note for this loan again called for the Launius Parties to repay $130,000 in six months after obtaining an SBA loan. The note also contained an identical description of the collateral as the prior two notes.

¶ 15                         B. Launius' Negotiations with Stern and Steinberg

¶ 16     By November 2017, the Launius Parties had defaulted on all three notes. The Smith and Arabo parties accelerated the loans and all principal, interest, and other applicable charges that were due and payable. Still unable to obtain an SBA loan, Launius continued to seek additional capital to pay off his rising debts. Sometime in the fall of 2017, Launius contacted Stern, whom he knew from previous business dealings, about investing in We'll Clean. Stern was initially interested and talked to Steinberg about joining him in the potential investment opportunity.

¶ 17     Negotiations continued, and in April 2018, Stern and Steinberg presented Launius with an Asset Purchase Agreement for Avalon to buy all of We'll Clean's assets for $50,000. The Asset Purchase Agreement was accompanied by a Management Agreement for Launius to manage the day-to-day operations of the business for at least one year in exchange for another $50,000.

However, Stern and Steinberg learned of We'll Clean's debts and abandoned the deal before the parties signed either agreement.

¶ 18    Shortly thereafter, Launius informed Levinson that he wished to terminate We'll Clean's lease of the Property and "disappear for a while." Launius signed a document terminating the lease effective May 14, 2018. The following day, Stern and Steinberg signed a new lease for Avalon to operate a hand car wash on the Property under the name Auto Spa.

¶ 19                                    C. Pretrial Litigation

¶ 20    On October 9, 2018, Smith and Arabo filed their initial complaint in the circuit court against the Launius Parties and Stern, Steinberg, and Avalon. Counts I through III of the complaint alleged breach of contract against the Launius Parties for failing to repay the promissory notes. Count IV alleged that Launius fraudulently converted one of the loans for personal use rather than using it to pay a security deposit on a new We'll Clean location as contemplated by the parties.

¶ 21    The remaining counts of the initial complaint were directed against Stern, Steinberg, and Avalon. Count V sought to hold Stern and Steinberg liable for the Launius Parties' debts under the fraud exception to the general rule against corporate successor liability. Specifically, Smith and Arabo alleged that Stern and Steinberg orchestrated a "fraudulent scheme" for Launius to transfer We'll Clean's assets and file for bankruptcy so as to avoid repaying the promissory notes. Similarly, Count VI alleged that Avalon's acquisition of the car wash was a fraudulent transfer under the Uniform Fraudulent Transfer Act (UFTA) (740 ILCS 160/1 et seq. (West 2018)) and was "made with the actual intent to hinder, delay, or defraud creditors[.]" Lastly, Count VII sought the creation of a constructive trust to prevent Stern, Steinberg, and Avalon from being unjustly enriched at the expense of the Launius Parties' creditors.

¶ 22 On May 31, 2019, the Launius Parties filed a four-count crossclaim against Stern and Steinberg. Count I of the crossclaim alleged that Stern and Steinberg engaged in unfair competition in violation of the federal Lanham Act (15 U.S.C. § 1125(a) (2018)) by using We'll Clean signage and "trade secrets" such as We'll Clean's customer list. Counts II and III alleged that Stern and Steinberg fraudulently acquired the car wash business by falsely representing to Launius that they were interested in investing in We'll Clean and wanted to help the business grow. Finally, count IV sought to impose a constructive trust on Avalon's revenue to prevent Stern and Steinberg's unjust enrichment. Notably, the crossclaim did not name Avalon as a crossdefendant, but only as "d/b/a" of Stern and Steinberg.

¶ 23 On December 18, 2019, the Smith and Arabo Parties settled their claims against the Launius Parties. The Smith and Arabo Parties then filed an amended complaint adding an allegation that Stern, Steinberg, and Avalon tortiously interfered with the loan contracts between the Smith and Arabo Parties and the Launius Parties.

¶ 24 Next, the Launius Parties filed an amended crossclaim against Stern and Steinberg to add claims for violations of the Illinois Trademark Registration and Protection Act (765 ILCS 1036/1 *et seq.* (West 2018)), the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510/1 *et seq.* (West 2018)), and the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2018)).

¶ 25 In December 2023, the Launius Parties sought leave to file a second amended crossclaim, which the court allowed over Stern and Steinberg's motion to strike certain counts and impose sanctions pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018). Like the original crossclaim, the first and second amended crossclaims did not name Avalon as a crossdefendant.

¶ 26    We'll Clean then filed for Chapter 7 bankruptcy protection in the United States Bankruptcy Court for the Northern District of Illinois on January 4, 2024. On May 21, 2024, the bankruptcy court ruled that any claims for fraudulent transfers or a constructive trust belonged to We'll Clean's bankruptcy estate and could therefore be pursued only by the estate's trustee.

¶ 27    On June 14, 2024, the trustee filed a third amended crossclaim against Stern and Steinberg. Therein, the trustee raised claims for trademark violations (count I), unfair business practices (count II), fraud in the inducement (count III), theft of trade secrets (count VI), tortious interference with a business expectancy (count IX), conversion (count XI), fraudulent transfers (counts XII and XIII), and the creation of a constructive trust (count XIV). As with all previous versions of the crossclaims in this case, the third amended crossclaim did not name Avalon as a crossdefendant.

¶ 28                                D. Bench Trial

¶ 29    The matter advanced to a 5-day bench trial beginning on July 8, 2024. The Smith and Arabo parties proceeded on two counts: (1) successor liability for We'll Clean's debts against Avalon based on fraud, and (2) tortious interference with a contract against Stern, Steinberg, and Avalon. The trustee proceeded on all nine counts against Stern and Steinberg raised in the third amended crossclaim.

¶ 30                                1. Smith and Arabo

¶ 31    At trial, Smith testified that he first heard of Launius in late 2016 from a private "loan procurement broker" named David Antonelli. Through Antonelli, Smith learned that Launius was seeking a short-term loan to pay creditors and increase his credit score to obtain an SBA loan. In January 2017, Smith and U.S. Placement loaned the Launius Parties $100,000 in exchange for repayment of $130,000 by July 2017. The loan was subsequently extended by six months in order to give Launius more time to raise his credit score. Under the addendum, the principal increased

to $157,250 and the repayment amount increased to $180,000. Smith also loaned the Launius Parties another $100,000 in July 2017. Per the terms of that promissory note, Smith dispersed the loan amount by delivering a check to a real estate firm as a "security deposit" to open a second We'll Clean location in Wrigleyville.

¶ 32    Similarly, Arabo testified that he first learned of Launius sometime in 2017 when Smith notified him of a potential investment opportunity with We'll Clean. In July 2017, Arabo loaned the Launius Parties $100,000, which was to be repaid as $130,000 in six months. Arabo dispersed the loan amount by writing checks directly to the IRS and other creditors of the Launius Parties.

¶ 33    Smith explained that Launius was never able to raise his credit score high enough to qualify for an SBA loan. Smith also later learned that Launius had a felony fraud conviction, which on its own made him ineligible for an SBA loan. Without the SBA loan, the Launius Parties were unable to pay their debts to the Smith and Arabo Parties. By October 2017, the Launius Parties were behind on all three notes. Smith met with Launius about the missed payments sometime in November 2017, and Launius assured Smith that he would be able to resume payments by January 2018.

¶ 34    However, the Launius Parties did not make the December 2017 or the January 2018 payment, so Smith and Arabo met with Launius again to discuss options such as bringing in an equity partner or finding additional lenders. Documentary evidence showed that Launius represented to Smith and Arabo that he and Antonelli were pursuing numerous leads to acquire new capital for We'll Clean around this time. One such potential investor was Launius' cousin "Greg," who supposedly owned a car dealership. However, none of these leads materialized for We'll Clean. As the Launius Parties continued to miss payments, Smith perfected his security by filing UCC-1 financing in February 2018.

¶ 35    Smith and Arabo also both testified that they learned about Stern and Steinberg when Steinberg called Smith "completely out of the blue" in April 2018. According to Smith, Stern and Steinberg represented themselves as friends of Launius who were trying to help him with his financial difficulties. Steinberg claimed to have connections with local car dealerships that he could use to bring in business for We'll Clean. Stern was said to be the "operations-type guy" who would help Launius "clean[ ] up the back room side" of his business. At the time of this phone call, Smith and Arabo were unaware of any other dealings between the Launius Parties and Stern and Steinberg.

¶ 36    On May 3, 2018, Smith emailed Launius offering to restructure the loans and waive some interest payments. Smith left the offer open until May 15, 2018, the date by which Launius had said his cousin Greg would finally decide whether to lend him money. On May 14, 2018, Launius informed Smith that Greg decided not to invest in We'll Clean.

¶ 37    Smith did not hear much from Launius in the following weeks. On July 3, 2018, Launius called Smith and told him that he was no longer in control of the car wash. Launius asked for "immunity" from Smith's attorney before he would say anything more. Smith was "floored" that Launius had lost the business but declined to grant him immunity. Smith suspected something was "amiss" because We'll Clean was a profitable company and Launius' sole source of income. Eventually, Launius "came clean" and admitted that he had been negotiating a deal to form a new partnership with Stern and Steinberg. However, when Launius refused to file for bankruptcy as part of the plan, Stern and Steinberg "turned on him and kept the business."

¶ 38    The record shows that Smith and Launius continued to communicate regularly after the July 3 conversation. Smith acknowledged that he discussed funding a lawsuit for Launius to sue

Stern and Steinberg and "get the company back." Instead, Smith and Arabo ultimately filed claims against the Launius Parties and Stern, Steinberg, and Avalon.

¶ 39    Smith calculated that the Launius Parties owed a total of "approximately" $498,600 on the three notes as of May 15, 2018. By the time of trial, that number had risen to $1,207,250 and was accruing about $283 in interest per day. In 2019, Smith and Arabo settled their claims against the Launius Parties for approximately $531,000. As part of the settlement, Smith paid an additional $31,000 in legal fees on behalf of the Launius Parties.

¶ 40                                    2. Stern and Steinberg

¶ 41    Stern testified that he had known Launius for many years, and that Launius was a customer of his credit repair business. Sometime in the fall of 2017, Launius approached Stern about investing in We'll Clean, stating that he wanted to expand the business with the help of "some young, smart guys that know how to do the internet[.]" Launius initially asked for $1,000,000 in exchange for a 50% stake in We'll Clean. About a week later, Launius amended his offer to $500,000 for 50% of We'll Clean. Stern thought the price was still too high, but was interested enough to learn more about We'll Clean's financials. Stern also reached out to Steinberg about the opportunity, as he and Steinberg had done several previous business ventures together.

¶ 42    Stern and Steinberg signed nondisclosure agreements and met with Launius on March 7, 2018. Following the March 7 meeting, Stern emailed Launius requesting certain financial information from We'll Clean. Stern received some, but not all, of the information from We'll Clean.

¶ 43    Stern and Steinberg next meet with Launius on March 19, 2018. At this meeting, Stern presented Launius with an untitled, one-page document declaring the intent to operate the car

wash through a "new corporation" owned 51% by Stern and Steinberg and 49% by Launius. This letter of intent also described the parties' respective duties in the new venture, including that Stern would "handle all the financial aspects of the business" and "manage social media and Internet presence." Steinberg was to "be in charge of all promotional goods" and "attracting outside vendors to advertise" with the business. Stern, Steinberg, and Launius would also "discuss David's schedule at the car wash and other key people." The letter of intent further states that Stern and Steinberg would provide the business with a $50,000 line of credit and refrain from drawing a paycheck for one year. They would also work to become current on payroll and rent within the first 60 days of the new venture.

¶ 44 Below the typewritten text of the document, Launius added hand-written notes stating "Buy/Sell some kind of plan, to be determined," and "49% $125k year— $125k stay in bus[iness]." Steinberg testified that he did not recall exactly what Launius meant when he added the "125k" language to the document. Stern testified that it meant he and Steinberg would pay Launius $125,000 for the 51% share and inject another $125,000 into the new business. Launius testified that he was to receive a salary of $125,000 and that he wrote that "125k stays in bus[iness]" because Stern and Steinberg wanted him to forgo a salary for the first year in favor of reinvesting the money into the business. Stern, Steinberg, and Launius all signed or initialed the letter of intent.

¶ 45 Following the March 19 meeting, Stern directed his attorneys to prepare an Asset Purchase Agreement and Management Agreement for Launius to sign. Under the Asset Purchase Agreement, Avalon would buy all of We'll Clean's tangible and intangible assets for $50,000. The related Management Agreement provided that Launius would "supervise, direct, and control the day to day business activities" as manager of the new business for one year in exchange for a "Management Fee" of $50,000. Stern testified that he and Steinberg offered a low amount for

We'll Clean's assets because they had not received much financial information from We'll Clean. Documentary evidence in the record corroborates Stern's unsuccessful attempts to receive financial information from Launius. Stern testified that Launius was "very happy" with the documents and "wanted to move forward" without any amendments. Stern sent Launius copies for him to sign on or around April 8, 2018.

¶ 46    However, on April 10, 2018, Launius called Stern and told him about the Launius Parties' debts to the Smith and Arabo Parties. Stern and Steinberg were unaware of Launius' debts before this conversation, and the debts did not appear in the financial information disclosed by We'll Clean. Launius sent Stern copies of the promissory notes, and Stern discovered the UCC-1 financing statement that Smith had filed against We'll Clean. Upon learning of these debts, Stern immediately told Launius that he was no longer interested in purchasing or investing in We'll Clean.

¶ 47    Steinberg testified that Stern called him on April 10 and told him that they needed to walk away from the deal because of the newly-discovered debts to the Smtih and Arabo Parties. Steinberg called Launius shortly thereafter and confirmed what he had heard from Stern. Launius gave Steinberg Smith's phone number, which Steinberg used to call Smith on April 12, 2018. Steinberg did not recall the details of the conversation other than that Smith confirmed the existence of the Launius Parties' debts. Stern characterized the phone call as a "[H]ail [M]ary" attempt to settle the debts for "pennies on the dollar" because Launius told them that Smith was "a pushover." However, Smith did not want to settle the debts, so Steinberg called Launius and affirmed that he and Stern were no longer interested in purchasing We'll Clean.

¶ 48    A few days later, on April 14, 2018, Launius called Stern and stated that he "had skeletons in his closet" and "needed to go away for a while." Launius asked Stern and Steinberg whether

they would consider meeting with Levinson and "starting a whole new business" on the Property without him. On April 19, 2018, Stern and Steinberg met Launius and Levinson at Levinson's office. Stern and Steinberg both testified that Launius told Levinson that he had "skeletons in his closet" and needed to "disappear for a little while." Launius asked to terminate his lease and Levinson allowed him to do so. Both Stern and Steinberg testified that they did not pay or pressure Launius in any way to terminate his lease.

¶ 49 After meeting with Levinson and learning that Launius was surrendering the lease, Stern and Steinberg began setting up Avalon to operate a new car wash on the Property. Avalon was created on April 23, 2018, and opened a bank account on May 7, 2018. Avalon then signed a new lease with Levinson and began operating a hand car wash on the Property under the name Auto Spa Chicago.

¶ 50 Auto Spa began operations on May 15, 2018. On that day, Stern and Steinberg gathered the former We'll Clean employees, explained that they had started a new company, and offered them jobs on similar terms as those they had with We'll Clean. Key We'll Clean employees like bookkeeper Joanna Maslowki, manager Jose Briseno, and Launius' sister Nanci Launius (Nanci) agreed to work for Avalon. Stern and Steinberg both testified that Launius was not involved with Avalon in any way.

¶ 51 Stern and Steinberg also both testified that they changed the locks on May 15, 2018, and provided their new employees with uniforms that said "Auto Spa Chicago." Avalon also compensated former We'll Clean employees for some of the paychecks they did not receive during We'll Clean's final year. Additionally, Avalon agreed to honor prepaid memberships that customers had purchased from We'll Clean for a period of up to one year.

¶ 52    Stern and Steinberg further testified that some large "We'll Clean" signs remained on display for a time because Levinson refused their requests to remove them. An outdoor awning also bore the We'll Clean name, but it was eventually painted over with Levinson's permission. Avalon retained the same phone number previously used by We'll Clean. Avalon also used some supplies and equipment that Launius left on the Property despite Stern and Steinberg's efforts to get him to take them away.

¶ 53    Emails and text messages show that Launius continued to communicate with Stern and Steinberg for a short time after Auto Spa opened on May 15, 2018. Stern explained that he was still friends with Launius and would occasionally ask him for "friendly advice" on a number of topics. Steinberg testified that he communicated with Launius primarily to "keep the peace" and convince him to remove his belongings from the Property.

¶ 54    The Smith and Arabo Parties and the trustee highlighted several specific communications at trial. For instance, on the evening of May 16, 2018, Launius sent Stern a text message reading, "Good night almost 4000 today." Stern replied the next morning, "David please do not text us this information. Are starting to fall off the wagon with the texting. Zero bubble[.]" Stern then explained that "zero bubble" was a reference to a submarine using an undetectable "secret propulsion system" in the movie The Hunt for Red October. Stern testified that he assumed Launius was referring to Auto Spa's revenue for that day, but was not sure where he heard that figure. Stern testified that he told Launius not to discuss the business because Launius was no longer involved. Stern denied telling Launius to delete any text messages.

¶ 55    On May 22, 2018, Stern left Launius a voicemail stating that he wanted to speak with him to get everybody "on the same page." Stern continued that he and Steinberg were "trying to help you and help this place, but when you're calling these guys and texting everybody with different

orders, it's just not working." Stern testified that the message was meant to "lure [Launius] in and read him the riot act" because he was upset that Launius was still communicating with former We'll Clean employees and causing confusion about who was operating the car wash. Steinberg recalled an incident in which he banned Launius from the Property and filed a police report because Launius "showed up screaming and yelling."

¶ 56    Stern also testified that the "final straw" in his deteriorating personal relationship with Launius occurred shortly before the May 22 voicemail when Launius retained a check from a Mini Cooper dealership that had purchased car washes from We'll Clean. On May 23, 2018, Steinberg sent Launius a text message "warning" him not to touch the check. Although the check was for services rendered by We'll Clean, Stern and Steinberg were angry because Launius had promised to use the check to compensate them for paying overdue rent and employees' backpay.

¶ 57                                  3. Launius

¶ 58    Launius confirmed that he met Smith and Arabo through Antonelli because he was seeking a loan to pay off debts and increase his credit score for purposes of obtaining an SBA loan. He borrowed a total of $357,250 from the Smith and Arabo Parties in 2017, but defaulted within five or six months because his "plans of expansion and earning more money didn't pan out fast enough." Launius also acknowledged that he now knew that he could not qualify for an SBA loan because of a previous felony conviction for "bank fraud." Launius testified that Antonelli knew about the conviction all along, but did not tell him that it affected his SBA eligibility until after he took out the loans with the Smith and Arabo Parties. Launius never told Smith about the conviction because Antonelli "forbid" him from communicating with Smith.

¶ 59    Launius further corroborated that he approached Stern, whom he had known as a business acquaintance for many years, about investing in We'll Clean. Stern brought in Steinberg, who

Stern represented as a "marketing genius" with connections to local car dealerships. These negotiations led to the signing of the letter of intent in March 2018. According to Launius, the intent was to create a new company in order to avoid We'll Clean's liabilities, including those to the Smith and Arabo Parties. However, Launius later realized that Stern and Steinberg actually had a "master plan" to force him out of the business.

¶ 60    Contrary to Stern and Steinberg, Launius testified that he told Stern about the loans from the Smith and Arabo Parties well before they signed the letter of intent. Launius also testified that Stern pressured him to make We'll Clean's debts "go away" by filing for bankruptcy and signing the Asset Purchase Agreement, but Launius refused to do so.

¶ 61    Launius also recalled giving Smith's phone number to Steinberg so that they could "work something out" regarding the debts to the Smith and Arabo Parties. Launius claimed that he and Stern also listened to the call from Stern's office, which Stern and Steinberg both denied.

¶ 62    Also contrary to Stern and Steinberg (and Levinson), Launius testified that it was Stern who proposed a meeting with Levinson. According to Launius, the main topic of the meeting was Stern's request to put the lease in his (Stern's) name because he knew Launius was behind on the rent and unable to pay. Launius testified that he did not request any changes to the lease at the meeting with Levinson. Nevertheless, Launius acknowledged that he terminated his lease shortly after the meeting with Levinson.

¶ 63    Launius further testified that he believed he became "partners" with Stern and Steinberg based on the signed letter of intent. However, Launius learned that Stern and Steinberg were in fact operating a new car wash on the Property on May 17, 2018. Launius testified that he was not involved with the business after that but did communicate with former We'll Clean employees to explain why he was no longer around. Launius texted Stern and Steinberg about business matters

prior to May 17 because he believed that they were partners at that time. Launius claimed that Stern told him to delete his text messages and to not call or text him shortly after the May 16 "zero bubble" message. Stern did not explain why he wanted Launius to delete his messages, but Launius did not do so.

¶ 64    On cross-examination, Launius reiterated his belief that he became partners with Stern and Steinberg based on the signed letter of intent. However, Launius also acknowledged numerous details were missing from the letter and explained that he "assumed" more formal documents would need to be signed in the future. Launius received the Asset Purchase Agreement from Stern but did not sign it because it was inconsistent with the letter of intent. Launius never told Stern that he wanted any revisions to the Asset Purchase Agreement.

¶ 65    Launius was also generally evasive, nonresponsive, and, at times, inconsistent when confronted with evidence that he and Antonelli led Smith and Arabo to believe they were still looking for investors after the letter of intent was signed. For example, defense counsel questioned Launius about several messages in which he avoided meeting with Smith and Arabo, but told them he was still negotiating with potential investors such as his cousin Greg and several people he met through Antonelli. When pressed about telling Smith that he was still trying to sell all or part of We'll Clean even after signing the letter of intent, Launius explained that he meant to say that he was looking for investors to buy Smith out and assume his right to collect on the loans. Launius could not explain what he meant when he told Smith that he was looking to sell "equity" to potential investors.

¶ 66    Finally, Launius testified that he signed the lease termination agreement both "in furtherance of the joint venture" with Stern and Steinberg, but also because he "fear[ed] for his life" after being threatened by Stern. Specifically, Launius explained that sometime after signing

the letter of intent on March 19, Stern became angry that Launius would not file for bankruptcy. Stern turned his back to Launius at a meeting and turned back around with a gun in his hand. Launius testified that he felt threatened and signed the lease termination agreement under duress shortly thereafter. Launius acknowledged that he did not mention the gun incident to Levinson or in his testimony on direct examination. Without objection, the defense admitted an exhibit into evidence highlighting inconsistencies in Launius's descriptions of the gun incident among the police reports, his deposition, and various versions of the Launius Parties' crossclaims.

¶ 67                                    4. Levinson

¶ 68    Levinson's testimony was essentially consistent with Stern and Steinberg's, and inconsistent with Launius' in several respects. Levinson testified that We'll Clean was his tenant for most of the time between November 2002 and May 2018. We'll Clean had a series of three-year leases over this period because Levinson would often receive unsolicited inquiries about the Property and he wanted to be able to sell it if he was offered the right price. We'll Clean's final lease began on November 1, 2017 and was originally set to end on October 31, 2020.

¶ 69    Levinson explained that Launius asked to meet with him in April 2018, but would not say what he wanted to discuss other than to introduce him to Stern and Steinberg. Launius arrived at Levinson's office early on the day of the meeting and immediately stated, "I want out of my lease. I can't run my business anymore" before even greeting Levinson. Levinson agreed to terminate the lease and said he would have his attorney draft a document for Launius to sign.

¶ 70    When Stern and Steinberg arrived, they introduced themselves and expressed an interest in leasing the Property to operate a car wash through a "brand new entity." They discussed plans to upgrade the facilities by installing things like new lighting, decor, and an automated point-of-sale system. Both Stern and Steinberg explicitly denied that Launius would be involved in the new

venture, stating, "Let us be clear with you. We have nothing to do with We'll Clean. We have nothing to do with David Launius."

¶ 71    Levinson asked Launius if he was sure about terminating the lease, and Launius confirmed that he was. Launius told Levinson that he was "going to have to disappear for a while" because he had "skeletons in [his] closet that will be coming out." Stern and Steinberg agreed to sign a new lease with Levinson to begin in May 2018.

¶ 72    Levinson next spoke to Launius on May 6, 2018, when he informed Launius that the lease termination paperwork was ready. Launius signed the document in a one-on-one meeting with Levinson on May 11, 2018. During the meeting, Launius explained that he needed money because the IRS was threatening to shut We'll Clean down if he did not pay what he owed. However, Launius "got screwed by a loan broker," presumably Antonelli, who assured him he could cover his debts through an SBA loan that he never received.

¶ 73    Launius next contacted Levinson about a week later and asked to meet him for breakfast on May 19, 2018. At the breakfast meeting, Launius explained that he tried to get money from Stern and Steinberg, but they would not give him any. Launius showed Levinson copies of the Asset Purchase Agreement and Managerial Agreement. Levinson asked Launius, "This isn't signed. Do you think you're partners with these guys?," to which Launius replied, "I don't know." Levinson asked, "What do you mean you don't know?" Launius again replied, "I don't know." The breakfast meeting was the last time Levinson saw Launius, although they exchange some calls and text messages after that.

¶ 74    Regarding the We'll Clean signage, Levinson testified that when We'll Clean moved into the Property, Launius brought two large neon signs bearing the We'll Clean name. At least one of the signs was about 14 feet long. Levinson allowed Launius to install the signs into the walls on

the side and front of the building. When Avalon took over in May 2018, Stern and Steinberg asked Levinson to remove the We'll Clean signs, but Levinson did not want to do so because it would be difficult and expensive to remove the signs without damaging the building. However, Levinson allowed Stern and Steinberg to remove other We'll Clean signage and paint over an awning bearing the We'll Clean name. Levinson estimated that he gave Stern and Steinberg permission to paint the awning in the Spring of 2019. Levinson also later paid to have the large We'll Clean signs professionally removed in June 2019.

¶ 75                                          5. Maslowski

¶ 76    Maslowski testified she was the "bookkeeper" for We'll Clean from 2008 to 2018, at which point she joined Avalon in the same position. Maslowski explained that by 2010, Launius and "owed a lot of back taxes" and had "a fear of being levied by the IRS." Beginning in 2012, Launius instructed Maslowski to deposit We'll Clean's revenue into a bank account owned by We'll Clean It. Launius instructed her to maintain a "very low balance" in We'll Clean's account to "avoid any levies from the IRS or from creditors." Maslowski testified that the IRS froze the We'll Clean account twice in 2012, and that We'll Clean received collection notices from many other creditors around that time. Maslowski's testimony and bank statements from 2017 and 2018 show that We'll Clean paid its bills with funds received through monthly transfers from the We'll Clean It account. Maslowski testified that We'll Clean had many creditors aside from the Smith and Arabo Parties in 2018.

¶ 77    Maslowski further testified that she met Stern in March 2018 when Launius introduced him as a potential investor. At Launius' direction, Maslowski provided Stern with some bank statements for We'll Clean but not for We'll Clean It. Maslowski prepared similar documents for many people because Launius "was always looking for investors."

¶ 78    At some point in May 2018, Launius invited Maslowski to his home and told her that he needed to "walk away and stay away" because he had "a lot of skeletons in his closet." He would not provide any further details. Shortly thereafter, Stern informed Maslowski about the change in operations and offered her a job with Avalon. Under Stern and Steinberg's leadership, Avalon made several changes such as upgrading the building and washing equipment, installing a new point-of-sale system, and purchasing new accounting software. Avalon also compensated most former We'll Clean employees for at least some of the pay that they did not receive during the final year of We'll Clean.

¶ 79                                    6. Nanci Launius

¶ 80    The testimony of Nanci Launius was presented via evidence deposition. Nanci testified that she started working for We'll Clean when David founded the company in the early 1980s. Prior to 2018, Nanci was the "membership director" and focused on cultivating and maintaining relationships with We'll Clean's regular customers. Nanci estimated that approximately 80% of We'll Clean's revenue came from nearly 3,000 customers who purchased individual memberships. We'll Clean also sold a smaller number of memberships to businesses like car dealerships. As membership director, Nanci maintained a physical collection of index cards with the personal information of We'll Clean's members. At some point, she also created a computerized database with the same client information.

¶ 81    Nanci met Stern and Steinberg in April 2018 when David introduced them as his new "partners" in the business. According to Nanci, Stern and Steinberg stated on multiple occasions that she and David were vital to the new business. Nanci also testified that Stern and Steinberg never told other We'll Clean employees or customers that David had left the business. When customers asked about David's whereabouts, Steinberg would falsely tell them that he was out of

town. Avalon used the same equipment, membership forms, and telephone number as We'll Clean. Avalon eventually displayed an "Under New Management" sign, but not until either August or September 2018.

¶ 82    Nanci further testified that the physical database of customer information was "stolen off [her] desk" sometime after Stern and Steinberg took over. In October 2018, Steinberg revoked Nanci's access to the computerized version for unspecified "security reasons." After that, she was assigned various new tasks such as greeting customers and cleaning the restrooms. She served in this new role for a few weeks before being "let go" in November 2018.

¶ 83    Finally, Nanci testified that she did not receive any pay from We'll Clean in 2018. Although other former We'll Clean employees received back pay from Avalon, Nanci did not receive any money despite Stern and Steinberg's promise to "make everybody current." Stern and Steinberg told Nanci that the matter was "between [her] and David." Nanci acknowledged that Avalon paid her in full and on time beginning in May 2018.

¶ 84                                6. Michael Goldman

¶ 85    Michael Goldman testified as the trustee's expert in business valuation. Goldman explained that the three general approaches experts use to evaluate the business are the asset approach, the income approach, or the market approach. The asset approach is more applicable to businesses with many tangible assets like the heavy machinery used in a manufacturing business. The income approach focuses on the income and cash flow of a business. Finally, the marketing approach looks at transactions involving comparable business and makes certain adjustments according to specific characteristics of the business being valued.

¶ 86    Goldman opined that the marketing approach was the best way to value We'll Clean because it had "[m]inimal" tangible assets and unreliable internal accounting. The market approach

primarily focuses on revenue, which Goldman described as "usually the most reliable number" because it is reported on tax returns and bank statements.

¶ 87     Under the market approach, Goldman searched for transactions involving similar companies in a commercial database called DealStats. Goldman examined 158 transactions for car washes on DealStats and compared them to We'll Clean's reported revenue. Through this analysis, Goldman estimated that the "enterprise value" of We'll Clean in May 2018 was approximately $1,010,000. Goldman explained that the enterprise value assumes that the company has no debt, so he did not factor any debts We'll Clean may have had into his valuation. Goldman knew that Smtih was secured creditor, but did not know whether We'll Clean had other long-term or secured debts.

### 7. Mark Kucik

¶ 88     Mark Kucik testified as the defense's expert in small business valuation. Kucik reviewed Goldman's report and the underlying data such as depositions, financial statements, balance sheets, and transactions from the DealStats database. Kucik opined that Goldman should not have relied heavily on the market approach because many of the DealStats transactions involved car washes that were not comparable to We'll Clean. Instead, Kucik testified that Goldman should have given greater consideration to the income and asset approaches because they give a more specific sense of what is actually being transferred in the sale of a particular business.

¶ 89     Using the asset approach, Kucik determined that We'll Clean had only $2,000 worth of tangible assets and insufficient "working capital" to pay its debts. Kucik also explained that a hypothetical purchaser would have been unable to ascertain the extent of We'll Clean's debts because many of its liabilities did not appear on its balance sheets or tax returns. According to

Kucik, the lack of reliable financial information would make it extremely difficult for We'll Clean to find a willing buyer.

¶ 90                                    D. Motion to Amend Crossclaim

¶ 91    The trial concluded on July 12, 2024. Approximately three weeks later, on August 1, 2024, the trustee sought leave to file a fourth amended crossclaim in order to add Avalon as a crossdefendant.

¶ 92    Stern, Steinberg, and Avalon filed a response arguing that the Launius Parties' former attorney made a tactical decision to characterize Avalon as a "d/b/a" in order to maintain Stern and Steinberg as individual defendants. Stern, Steinberg, and Avalon also submitted that the trustee had ample opportunity to correct the mistake prior to trial, but chose not to do so until after hearing Stern and Steinberg's argument that they were not liable because they were not transferees of any We'll Clean assets as individuals.

¶ 93                                    E. Circuit Court's Ruling

¶ 94    The circuit court announced its ruling in a written order on October 8, 2024. As to the Smith and Arabo Parties' complaint, the court stated that the evidence did not support a claim that Avalon acquired We'll Clean's assets through fraud or that Avalon was a mere continuation of We'll Clean. Ultimately, the court concluded that there was no credible evidence that Launius terminated his lease because of false representations or threats, or that Stern and Steinberg participated in Launius' efforts to avoid creditors. In so ruling, the court opined that its determination was supported by credible testimony from Levinson, Stern, and Steinberg, and that Launius' testimony to the contrary was generally "confusing, inconsistent, [and] lacked credibility regarding significant matters[.]"

¶ 95    Regarding the trustee's claims, the court first ruled that the trustee did not establish a claim for trademark violation or conversion based on the "limited use" of We'll Clean signage and supplies left behind by Launius. The court also observed that Stern and Steinberg painted over the awning, asked Levinson to remove the large We'll Clean signs, and asked Launius to remove his supplies to no avail.

¶ 96    Consistent with its findings on the Smith and Arabo Parties' claims, the court also found that the trustee had not presented any evidence that Stern or Steinberg induced Launius to terminate his lease. Rather, the evidence showed that Launius voluntarily terminated his lease on his own. The court opined that Lauinius' testimony to the contrary was "not credible when viewed and weighed against all other credible testimony and evidence."

¶ 97    In addressing the trustee's fraudulent transfer claims, the court first found that We'll Clean's property was completely encumbered by Smith's UCC lien and therefore not an "asset" within the meaning of UFTA. The court also determined that We'll Clean received "reasonably equivalent value" for any transfer of the lease because terminating the lease relieved We'll Clean of a recurring liability that it could not pay. Essentially, the lease "produced no value, so it ha[d] no value."

¶ 98    The court also addressed the competing opinions of Goldman and Kucik. Specifically, the court stated that Goldman's failure to consider We'll Clean's debt "significantly undercut his opinion." On the other hand, the court credited Kucik's testimony that We'll Clean had little to no value because it was deeply in debt, severely undercapitalized, and not generating a positive cash flow.

¶ 99    Moreover, the court declined to impose a constructive trust because Stern and Steinberg were not the transferees of the We'll Clean assets and were not shown to have engaged in any

wrongful conduct. Consequently, the court entered judgment for Stern, Steinberg, and Avalon on all counts.

¶ 100   Finally, the court also denied the trustee's motion to amend the crossclaim, reasoning that "[a]dding Avalon [as a crossdefendant] would not change the Court's conclusion."

¶ 101   The Smith and Arabo Parties and the trustee filed separate timely notices of appeal. On December 4, 2024, this court granted the parties' agreed motion to consolidate the appeals.

¶ 102                                    II. ANALYSIS

¶ 103   The standard of review following a bench trial is generally whether the circuit court's judgment is against the manifest weight of the evidence. *Cadle Properties of Illinois, Inc. v. Fortune Investments, LLC*, 2022 IL App (1st) 200556, ¶ 23. A decision is against the manifest weight of the evidence "only when the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Total Staffing Solutions, Inc. v. Staffing, Inc.*, 2023 IL App (1st) 220533, ¶ 31. Under this well-established standard, we give significant deference to the circuit court's factual determinations because the court is in a superior position to observe the conduct and demeanor of the witnesses. *Matros v. Commonwealth Edison Company*, 2019 IL App (1st) 180907, ¶ 153. We will not substitute our judgment for that of the circuit court on matters involving witness credibility, the weight assigned to particular evidence, or the inferences to be drawn from the evidence. *Offord v. Fitness International*, LLC, 2015 IL App (1st) 150879, ¶ 16. However, whether the circuit court applied the correct legal test to the evidence is a question of law that we review *de novo*. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871.

¶ 104                          A. The Smith and Arabo Parties' Claims

¶ 105                                  1. Successor Liability

¶ 106   On appeal, we first address the Smith and Arabo Parties' claim that the circuit court erred by failing to hold Avalon liable for the Launius Parties' debts under the fraud exception to the general rule against successor liability.

¶ 107   It is well-settled that a corporation that purchases the assets of another corporation generally does not become liable for the debts of the transferor corporation. *Groves of Palatine Condominium Association v. Walsh Construction Company*, 2017 IL App (1st) 161036, ¶ 57. This general rule against successor liability has four main exceptions: (1) the parties had an express or implied agreement that the transferee would assume the transferor's liabilities, (2) the transaction amounts to a *de facto* merger of the parties, (3) the transferee is a "mere continuation" of the transferor, and (4) the transaction was done for a fraudulent purpose such as avoiding liability for the transferor's obligations. *People ex rel. Department of Human Rights v. Oakridge Healthcare Center*, LLC, 2020 IL 124753, ¶ 20.

¶ 108                                   a. Fraud Exception

¶ 109   Here, the Stern and Arabo Parties maintain that this case "falls squarely within the fraud exception to the general rule." In advancing this argument, the Smith and Arabo Parties contend that the circuit court's analysis was based on the erroneous finding that Launius terminated We'll Clean's lease voluntarily rather than as a result of fraud and misrepresentations from Stern and Steinberg. Essentially, the Smith and Arabo Parties assert, with little support, that the Launius' "clear intent" in transferring We'll Clean's assets was to avoid his debts to the Smith and Arabo Parties while taking "a significant managerial role in the new car wash[.]"

¶ 110   We disagree. In fact, as the circuit court found, the overwhelming weight of the evidence established that Launius voluntarily terminated his lease in exchange for nothing more than relief from the obligation to pay rent. While Launius at one time discussed retaining a managerial role

in the new venture with Stern and Steinberg, the evidence demonstrated those negotiations went nowhere. No witness testified that Launius remained involved in the car wash after terminating his lease, whether as a manager or otherwise. To the contrary, Stern, Steinberg, Maslowski, Launius, and Launius' sister Nanci all testified that Launius was not involved in Avalon.

¶ 111   Nevertheless, the Smith and Arabo Parties contend that Launius' communications with Stern and Steinberg after the lease termination show that he was still somehow involved in Avalon. However, the circuit court credited the testimony of Stern and Steinberg, who gave innocent explanations for these messages, and discredited the testimony of Launius, the only witness who testified that he sent the messages under the impression that he was in business with Stern and Steinberg. Again, the circuit court's credibility determinations and interpretation of ambiguous evidence is entitled to great deference. Moreover, our review of the messages is entirely consistent with Stern and Steinberg attempting to maintain a cordial personal relationship with Launius until his erratic behavior became too much. Launius' testimony that he believe he became partners with Stern and Steinberg was simply not credible.

¶ 112   The only other evidence of fraud cited by the Smith and Arabo Parties is the April 12, 2018, phone call between Smith and Steinberg. According to the Smith and Arabo Parties, the fact that Steinberg called Smith to negotiate a deal after learning of the debts proves that Steinberg and Smith were not truly out of the deal with Launius. However, the evidence on this point was clear and accepted by the circuit court: Stern learned of We'll Clean's substantial debts on April 10, 2018, and immediately told Launius and Steinberg that the deal was off. Steinberg called Smith two days later and confirmed the existence of the debts. Smith was not interested in settling the debts, so Stern and Steinberg walked away and had no further dealings with Launius. Nothing about the phone call or its timing is indicative of fraud. It is entirely reasonable for Steinberg to

have wanted to confirm the debts and explore a quick and favorable resolution just two days after hearing about them from Stern.

¶ 113                              b. "Mere Continuation" Exception

¶ 114   Although they are sometimes considered distinct exceptions to the rule against successor liability, the Smith and Arabo Parties also intermingle with their fraud exception argument a similar claim that Avalon was a mere continuation of We'll Clean. Specifically, they emphasize that Avalon employed numerous former We'll Clean employees, used some supplies purchased by We'll Clean, used the same phone number as We'll Clean, displayed We'll Clean signs for a time, and paid for some of We'll Clean liabilities such as back pay to employees and vendors.

¶ 115   Although these factors have some relevancy to a mere continuation analysis, they were adequately considered and rejected by the circuit court. For example, the circuit court reasonably credited testimony that Avalon paid backpay and retained employees simply to gain the advantage of an experienced workforce for the new company. The Smith and Arabo Parties also ignore the weight of other evidence that shortly after Avalon began operating the car wash, it used its own uniforms, equipment, and signage. More importantly, Avalon made substantial property upgrades and policy changes from the business conducted by We'll Clean.

¶ 116   Additionally, Illinois courts have long held that the identity of ownership is the key element in establishing that a successor is a mere continuation of the previous entity. *Workforce Solutions v. Urban Services of America, Inc.*, 2012 IL App (1st) 11410, ¶ 87. Although ownership need not be completely identical, there must generally be a significant overlap in the ownership of the two entities. *Id.* ¶ 88. This rule promotes the purpose of the mere continuation exception, which is to prevent the transferring entity from escaping liability while also retaining control of the transferee. *Vernon v. Schuster*, 179 Ill. 2d 338, 346 (1997). Thus, our supreme court has emphasized that the

crucial inquiry is "whether there is a continuation of the *corporate entity of the seller*—not whether there is a continuation of the *seller's business operation*[.]" *Id.* (Emphases in original).

¶ 117   In this case, there was absolutely no overlap between the ownership of We'll Clean and Avalon. It is undisputed that Launius was the sole owner of We'll Clean and that Stern and Steinberg were the sole owners of Avalon. Additionally, as previously explained, there was no credible evidence that Launius played any role in Avalon. Under such circumstances, the circuit court correctly determined that Avalon was not a mere continuation of We'll Clean. Because the Smith and Arabo parties failed to prove any exception to the rule against successor liability, we affirm the circuit court's conclusion that Avalon was not liable for We'll Clean's debts to the Smith and Arabo Parties.

¶ 118                 2. Intentional Interference with Promissory Notes

¶ 119   We next consider the Smith and Arabo Parties' argument that the circuit court erred in ruling that Stern and Steinberg did not interfere with the promissory notes between the Smith and Arabo Parties and the Launius Parties.

¶ 120   To establish the tort of intentional interference with a contract, a plaintiff must prove that (1) the plaintiff had a valid and enforceable contract with another party, (2) the defendant was aware of the contract, (3) the defendant intentionally and unjustifiably induced the other party to breach the contract, and (4) the plaintiff suffered damages as a result. *Shrock v. Meier*, 2024 IL App (1st) 230069, ¶ 29.

¶ 121   In dispute here is the third element, whether Stern and Steinberg intentionally and unjustifiably induced Launius to breach the promissory notes. The Smith and Arabo Parties argue that Stern and Steinberg induced Launius to breach the notes by devising a "scheme" to

take over the car wash and give Launius a management role in the new business, or at least give Launius the impression that they would do so.

¶ 122    There are two obvious problems with this position. First, as explained, there is no evidence that Stern and Steinberg enticed Launius to breach his obligations to the Smith and Arabo Parties in exchange for a role in the new business. Instead, the evidence showed only that Stern and Steinberg briefly negotiated giving Launius a managerial role as part of the purchase of We'll Clean until they discovered the Smith and Arabo loans. The record is clear that the sale of We'll Clean and Launius' managerial role in Avalon never occurred. As no agreement was ever signed (aside from an extremely bare-bones and ambiguous letter of intent) Launius never had any reasonable expectation of becoming manager in Stern and Steinberg's new venture.

¶ 123    Second, the record is equally clear that the Launius Parties had already defaulted on—*i.e.* breached—the loan contracts before Launius met Stern or Steinberg. In an attempt to avoid this issue, the Smith and Arabo Parties contend that Stern and Steinberg interfered with the loan contracts at a time when Smith and Launius were attempting to "work out" some kind of arrangement for Launius to pay his debts. Setting aside the fact that the Smith and Arabo Parties provide no caselaw to support their theory, the record again belies their argument. Rather than attempting to "work out" anything with Smith, it appears that Launius was merely stringing Smith along to buy time. The record also demonstrates that Stern and Steinberg ended all negotiations with Launius almost immediately upon learning of the loan contracts. In any event, the evidence strongly suggests that Launius was unable to pay his debts to the Smith and Arabo parties regardless of the conduct of Stern and Steinberg. Thus, the circuit court correctly ruled against the Smith and Arabo Parties on their tortious interference claim.

¶ 124                              B. The Trustee's Claims

¶ 125                                    1. UFTA

¶ 126   We now turn to the trustee's arguments on appeal. The trustee primarily contends that the circuit court made numerous errors in concluding that Stern and Steinberg were not liable for We'll Clean's fraudulent "transfer" of "assets" under UFTA.

¶ 127                          a. Whether a "Transfer" Occurred

¶ 128   In deciding whether a *fraudulent* transfer occurred, the logical starting point is to determine whether a "transfer" occurred at all. UFTA broadly defines "transfer" to encompass "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." 740 ILCS 160/2(l) (West 2018). In this case, the trustee maintains that We'll Clean "transferred" its valuable intangible assets to Stern and Steinberg within the meaning of UFTA. However, the record supports the circuit court's conclusion that Stern and Steinberg did not receive valuable intangible assets. Although Avalon used We'll Clean's phone number and *de minimis* supplies such as buckets, sponges, and hoses left behind by Launius, this does not establish that Avalon received valuable intangibles like We'll Clean's goodwill or client relationships. Indeed, the record shows that Avalon honored prepaid memberships at its own great expense in order to establish relationships with We'll Clean's former clients.

¶ 129   At best, We'll Clean can be said to have "transferred" the remaining 28 months of its lease under UFTA's broad definition. The parties seem to agree that the prepetition termination of a lease constitutes a transfer under UFTA. Several courts have so held, at least where, as here, the debtor had a right to possess the property at the time of the termination. See, *e.g.*, *In re Great Lakes Quick Lube LP*, 616 F. 3d 482, 485 (7th Cir. 2016). However, in such cases, the courts

appear to have uniformly held that the transferee is the lessor. *Id.* Neither of the cases cited by the trustee hold that a transfer from the landlord to a subsequent tenant is an avoidable transfer. See *In re Indri*, 126 B.R. 443, 446 (Bkrtcy. D.N.J. 1991) (holding that the debtor's lease termination was a "transfer" to the original lessor and directing the debtor to file an adversary proceeding to determine whether it was avoidable against the lessor); *In re Queen City Grain, Inc.*, 51 B.R. 722, 726, 729 (Bankr. S.D.Ohio 1985) (holding that the termination of a lease between two related corporations was a "transfer," but granting summary judgment for a subsequent lessee). Thus, even accepting that We'll Clean's termination of its lease was a fraudulent transfer, it was avoidable as to Levinson as the transferee, not Stern, Steinberg, or Avalon. As Levinson was not a party to this litigation, the trustee's fraudulent transfer claim fails. We also note that although UFTA allows recovery against "any subsequent transferee other than a good-faith transferee who took for value," the trustee has not proven that Stern or Steinberg acquired We'll Clean's lease as a bad-faith transferee.

¶ 130                          b. Existence of a "Valid Lien"

¶ 131   Regardless of whether Stern, Steinberg, or Avalon were good-faith transferees, the trustee's UFTA arguments fail for other reasons. The trustee bases much of his position on the contention that the Smith and Arabo Parties did not have a "valid lien" against We'll Clean. Specifically, the trustee argues that the promissory notes for the Smith and Arabo Party loans did not create an enforceable security interest because the notes do not contain an adequate description of the collateral.

¶ 132   Under Illinois law, a security interest becomes enforceable when, among other things, the debtor has signed a security agreement that provides a description of the collateral. 810 ILCS 5/9-203(b)(3)(A). The purpose of requiring the security agreement to describe the collateral is to

allow the parties and their successors to identify the collateral. *Midkiff Implement Co. v. Worral*, 116 Ill. App. 3d 546, 549 (1983). In light of this purpose, a description of collateral "is sufficient, whether or not it is specific, if it reasonably identifies what is described." 810 ILCS 5/9-108(a) (West 2018). The test is whether the description of the collateral reasonably distinguishes it from other property with which it might be confused. *Midkiff*, 116 Ill. App. 3d at 549.

¶ 133    Here, the promissory notes described the collateral as "among other items, (i) monthly revenues of We'll Clean, Inc., its profits, and its assets, executed and delivered by the Borrower for the benefit of Lender, [and] (ii) A Personal Guaranty of herewith from David Launius[.]" The notes also described the collateral as "the revenues of We'll Clean, Inc., We'll Clean It, Inc., David Launius, or by the SBA loan" that the Launius Parties were to obtain. In our view, this description reasonably identifies the collateral. Although best practices arguably would have been to describe the collateral with greater detail, the description in the promissory notes fulfills the purpose of allowing the parties and others to identify what is and is not collateral. Notably, the language in the notes is more specific than the examples of inadequate descriptions listed in the statute. See ILCS 5/9-108(B)(c) (West 2018) ("[s]upergeneric" descriptions such as " 'all the debtor's assets' " or " 'all the debtor's personal property' " are not sufficient). Thus, we affirm the circuit court's finding that the security agreements in this case created a valid lien against We'll Clean.

¶ 134                                    c. Value of the Transferred Assets

¶ 135    Having established the existence of a valid lien, we must now decide how the lien affected the value of the transferred assets. Fundamentally, UFTA applies only to the "transfer" of "assets." The statute defines an "asset" as "property of a debtor," except "to the extent it is encumbered by a valid lien." 740 ILCS 160/2(b)(1) (West 2018).

¶ 136    The circuit court found that UFTA did not apply in this case because, as We'll Clean's property was encumbered by the Smith and Arabo Parties' lien, it was not an "asset" under the statutory definition. The trustee argues that the court erred because, even accepting that the lien was valid, *part* of We'll Clean's property remained unencumbered and was therefore subject to UFTA. In so arguing, the trustee cites *Pluciennik v. Vandernberg*, 2018 IL App (3d) 160726, ¶ 21, where the Third District ruled that property of a debtor remained an "asset" subject to UFTA to the extent its value exceeded any valid liens encumbering that property. Although we do not disagree with this conclusion from *Pluciennik*, we do disagree with the trustee's application of that principle to the facts of this case.

¶ 137    According to the trustee, the record shows that the amount of the lien on May 15, 2018 was $498,600. Subtracting that number from Goldman's enterprise valuation of $1,010,000, the trustee calculates that the unencumbered value subject to avoidance under UFTA was $511,400.[1]

¶ 138    The trustee's calculations rest on two flawed premises. First, the trustee derives unencumbered value only because, relying on Goldman's opinion, he assumes We'll Clean was worth $1,010,000 at the time the lease was terminated. However, the circuit did not credit this valuation and was not required to do so. Although the trustee cites cases stating that whether the Property Tax Appeal Board applied a proper valuation method is a legal question subject to *de novo* review (see, *e.g.*, *Kankakee County Board of Review v. Property Tax Appeal Board*, 226 Ill. 2d 36, 46 (2007)), in other contexts the value of a business remains a question of fact reviewed under the manifest weight of the evidence standard. *In re Marriage of Evanoff and Tomasek*, 2016 IL App (1st) 150017, ¶ 30; see also *In re Marriage of Liszka*, 2016 Ill App (3d) 150238, ¶

---

[1] The trustee's brief actually states that "$1,010,000-$498,600= $512,000." This appears to be merely a typographical, arithmetic, or rounding error.

40 ("As long as the court's valuation is within the range testified to by the expert witnesses, it ordinarily will not be disturbed on appeal unless it is against the manifest weight of the evidence.").

¶ 139    The circuit court's conclusions regarding the valuation of We'll Clean in this case were not against the manifest weight of the evidence. It was within the court's discretion to discount Goldman's valuation because he admittedly did not consider We'll Clean's substantial debts. The trial court was also entitled to credit Kucik's testimony that the lack of reliable financial information made We'll Clean virtually unmarketable, and that Goldman's methods were flawed because he relied on transactions that involved car washes too dissimilar to We'll Clean. Even Goldman testified that he primarily relied on tax returns because the other information was unreliable. The documents Goldman relied on did not show the Smith and Arabo debts, let alone other debts that the record suggests may exist. We also note that, despite Launius' best attempts to sell We'll Clean's equity, the best offer he apparently received was $50,000 and 1-year employment contract for $50,000. This suggests that We'll Clean's value was far less than the lien amount.

¶ 140    Second, as previously explained and despite the trustee's arguments to the contrary, the evidence showed that Avalon (as a subsequent transferee) received only the value of We'll Clean's *lease*. Thus, even accepting Goldman's testimony that the full enterprise value of We'll Clean was $1,010,000 at the time of the lease termination, Avalon received something less than that. As the circuit court noted, Goldman examined only the enterprise value, and so he did not opine on the value of the lease alone. Accordingly, there was no evidence of the lease's value, let alone that the value was high enough to be partially unencumbered. It was the trustee's burden to prove his claim, and he failed to do so.

¶ 141                                    d. Other UFTA Arguments

¶ 142   Because the trustee cannot show that the circuit court erred in determining that the Launius Parties did not "transfer" "assets," we need not belabor his other arguments such as whether Launius had fraudulent intent or received reasonably equivalent value. *Pluciennik*, 2018 IL App (3d) 160726, ¶ 17 (where an "asset" is not "transferred" within the meaning of the statute, UFTA does not apply). We affirm the circuit court's entry of judgment in favor of Stern and Steinberg on the trustee's UFTA claim.

¶ 143                                    2. Motion to Amend Crossclaim

¶ 144   Finally, the trustee argues that the circuit court erred in denying its motion to file a fourth amended crossclaim that would have added Avalon as a crossdefendant.

¶ 145   Generally, whether to allow the amendment of a pleading is within the sound discretion of the circuit court, and the court's decision will not be reversed on appeal absent an abuse of that discretion. *Romito v. City of Chicago*, 2019 IL App (1st) 181152, ¶ 21. However, a court should exercise its discretion liberally in favor of allowing amendment prior to entry of a final judgment. *Shrock*, 2024 IL App (1st) 230069, ¶ 42. "At any time before final judgment amendments may be allowed on just and reasonable terms, introducing any party who ought to have been joined as a plaintiff or defendant[.]" ILCS 735 5/2-616(a) (West 2018). When examining a circuit court's decision to deny amendment of a pleading, reviewing courts typically consider the following four factors adopted by our supreme court in *Loyola Academy v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 272 (1992): (1) whether the proposed amendment would cure any defects in the pleading, (2) whether the opposing party would be prejudiced or unfairly surprised by the amendment, (3) whether the amendment is timely, and (4) whether the party seeking to amend had previous opportunities to do so.

¶ 146 Here, the trustee contends that the circuit court should have allowed him to file a fourth amended crossclaim because he sought leave before the final judgment, could have plead a meritorious fraudulent transfer claim against Avalon, and would not have unfairly surprised Stern, Steinberg, or Avalon. We agree that, despite ample opportunity to have sought amendment earlier, these factors weigh in the trustee's favor. However, where it would have been futile to grant a party leave to amend, we need not consider the *Loyola Academy* factors. Rather, "we may begin and end our analysis with the observation that it is never an abuse of discretion to deny leave to amend when the proposed amendment would be futile." *Malacina v. Cook County Sheriff's Merit Board*, 2021 IL App (1st) 191893, ¶ 40. For reasons previously explained, adding Avalon as a crossdefendant would change nothing about the outcome of this case. Accordingly, the circuit court did not abuse its discretion in denying the trustee leave to file a fourth amended crossclaim.

¶ 147                                    III. CONCLUSION

¶ 148 For the reasons stated, we affirm the judgment of the circuit court.

¶ 149 Affirmed.